# JOHN M. GILL

*v.*

# SIMEON R. CROSBY.

1. PARTNERS IN PROFITS—*control of property.* Where A and B, after conducting business under a written partnership agreement, for the purchase, feeding and sale of cattle and hogs for a while, entered into a new verbal agreement, by which A was to purchase the stock, furnishing the money for that purpose and for all the expenses, except that B was to furnish slops from his distillery; and A was to have the entire control and sale of the stock, to receive the proceeds of sale, and retain therefrom all moneys advanced by him and ten per cent interest on one-half the amount, after which he was to divide, and pay to B one-half of the net profits, and the losses were to be equally divided: *Held,* that the new arrangement having superseded the partnership agreement, gave A the right to control the sale of the stock and receive the pay therefor.

2. SALE—*in fraud of partner's rights.* Where A and B were jointly interested in cattle fed by them for market, B's only interest being that he was to share equally with A in the profits and losses, while A, who furnished the money for their purchase and the principal part of the expenses, by agreement, was to have the entire control and sale of the cattle, and receive the proceeds of sales, and before any division, repay himself all moneys advanced and ten per cent on one-half of the amount, after which he was to pay B one-half of the net profits; and B, to defraud A, colluded with C, and sold and delivered to him the cattle, and received pay therefor, C being cognizant of the fraudulent purpose: *Held,* that C, by such purchase, acquired no title as against A, and that A was entitled to recover the cattle from C in an action of replevin.

3. SALE—*ratification in ignorance of fraud.* Where A and B were jointly interested in a lot of cattle, but, as between themselves, A had the sole control and right to sell and reimburse himself for advances, after which the net profits were to be equally divided, and B, by collusion with the purchaser, sold them with intent to receive the entire price in fraud of the rights of A, and the latter, on learning of the sale, but ignorant of the contemplated fraud, assented to its consummation, under an understanding that the purchase money was to be paid to him when the weight of the cattle was ascertained, and after the weighing, the purchaser set an hour for A to meet him at his office for settlement and payment, but before the time set he paid the full price to B: *Held,* that A was not bound by the

sale and delivery, and was entitled to recover possession of the cattle in replevin.

4. SALE—*notice before payment—of superior right.* A and B were jointly interested in a lot of cattle, fed by them for market. A furnished all the money for their purchase and expenses of keeping, etc., except that B furnished slops from his distillery. It was agreed between them that A was to have the sole control and disposal of them, and upon sale by him, was to retain from the proceeds the money advanced by him and ten per cent interest on half that sum; otherwise, they were to share equally in the profits and losses. B, without the knowledge or assent of A, executed a written agreement for the sale of the cattle, signing his and A's name thereto: *Held,* that if the sale was made to defraud A, and the purchaser participated in the fraudulent design, or if the purchaser was notified of A's rights at any time before the actual payment of the price to B, and he, by collusion with B to obtain possession of the cattle, paid B the full price, the purchaser, in either case, would not acquire any right of possession as against A, and that A could maintain replevin against the purchaser.

5. FRAUD—*evidence showing.* Facts and circumstances detailed, which, in the opinion of the court, fully warranted the jury in finding a fraudulent design and plan between a purchaser and a partner in profits and loss only, in the sale and purchase of property, to defraud the partner having the right of control and the principal interest.

6. SAME—*proof necessary to show.* From the fact that parties, entering into fraudulent schemes, endeavor to cover up their true purpose, and usually, as far as possible, adopt legal forms and the usual course of business to conceal their designs, clear and undisputed evidence of the existence of fraud is not required.

7. EVIDENCE—*admissions of vendor.* The statements and declarations of a vendor of chattels, made in the absence of the vendee, before the sale, are admissible in evidence in a suit by a person claiming the chattels, to prove title in the plaintiff before the sale. Such statements and declarations are binding upon the vendee as a privy by purchase from the vendor.

8. EVIDENCE—*instruction as to.* In a case where there was much and conflicting testimony, the court, in its charge, directed the jury to take into consideration the whole of the evidence and all the facts and circumstances proved, giving to the several parts of the evidence such weight as they might think the same entitled to; and that, in determining the weight to be given to the testimony of the several witnesses, they should take into consideration their interest, if any, their apparent fairness or bias, if any, their appearance on the stand, the reasonableness of the story told by them, and all the circumstances proved, corroborating or contradicting the witness, if any are proved: *Held,* no error.

9. NEW TRIAL—*finding as to facts.* In case of conflict of evidence, this court will not disturb the finding of the jury where the weight of evidence

does not appear the other way. The jury and court below have better means of ascertaining the truth in such cases from the appearance of the witnesses, their intelligence and manner on the stand, than an appellate court, who can only see the evidence on paper.

APPEAL from the Circuit Court of Schuyler county; the Hon. C. L. HIGBEE, Judge, presiding.

This was an action of replevin, brought by Crosby against Gill, for 115 head of cattle. The declaration contained two counts, the first alleging an unlawful taking and detention, and the second an unlawful detention. Defendant filed five pleas, to-wit: 1, *non cepit;* 2, *non detinet;* 3, property in defendant; 4, property in James A. McGrew; and 5, property in David Risinger. A *similiter* was joined on the first two, and replication to the others denying property in the several parties named in the pleas.

The principal facts are given in the opinion of the court. The circuit court allowed the plaintiff to prove, against defendant's objection, by Russell W. Crosby, son of plaintiff, that, in November, 1868, and before the sale to Gill, "Risinger told me that the cattle all belonged to father; that he furnished all the money to buy them; that he had full charge of them, of buying and selling; that he (Risinger) had nothing to do with the cattle; he was to furnish slop for them, and was to have a share of the net profits after cattle were sold." Also by Stephen Roney : that Risinger, in a conversation at Peoria, before the sale of the cattle, Gill not being present, said Crosby was going to feed cattle at his distillery; that he (Risinger) had nothing to do with it; that Crosby was to have the sole management of the stock part of the business. This testimony was objected to because Gill, the appellant, was not present.

Messrs. COHRS, ROBERTS & GREEN, for the appellant.

Mr. S. P. SHOPE, and Mr. J. K. COOPER, for the appellee.

Mr. JUSTICE WALKER delivered the opinion of the Court:

This was an action of replevin, brought by appellee in the
Tazewell circuit court against appellant, to recover 115 head
of cattle. The venue was afterwards changed to Fulton
county, and thence to Schuyler county. A trial was had, and
the jury found in favor of appellee. A motion for a new trial
was entered, but overruled by the court, and judgment ren-
dered on the verdict, and the case is brought to this court on
appeal.

It is claimed that the evidence does not support the ver-
dict; that the court admitted improper evidence on the part
of appellee; that the court refused proper instructions asked
by appellant, and gave improper instructions asked by ap-
pellee.

It appears that appellee, and Risinger, who was engaged in
carrying on a distillery, in the spring of 1868, entered into a
partnership agreement in writing for the purchase, feeding
and sale of stock cattle and hogs. By its terms appellee was
to purchase the stock, giving his time, to furnish one-half of
the money required for the purchase and other expenses at-
tending the feeding, except slops from the distillery. Risin-
ger, on his part, was to furnish the slops free of charge, and
one-half of the money to cover purchase, expenses, etc., each
party to share equally in profits and losses of the business.
About 300 head of hogs were purchased, fed and sold under
this agreement, and, as appellee claims, were paid for by him
with his money. Appellee claims that Risinger was unable
to furnish money to carry out the arrangement, when the
partnership was abandoned and a new verbal agreement was
entered into by the parties, by which it was understood that
appellee was to go on and stock the distillery yards and fur-
nish all the money required for the purpose and other ex-
penses, except the slops, which were to be furnished by Risin-
ger, and appellee was to have the entire control and sale

thereof; to receive the proceeds of the sales, and retain therefrom all moneys advanced and ten per cent interest on one-half of the amount, after which he was to divide and pay to Risinger one-half of the net profits, and the losses were to be equally divided.

Under this arrangement, some hogs and a few cattle were purchased during the spring and summer of 1868, which were fatted and sold by appellee, and the proceeds accounted for under the agreement. These facts are testified to by appellee and several other witnesses, but Risinger testifies that the first arrangement was not abrogated, but continued in full force. In September or October, 1868, appellee purchased the cattle in controversy. They were brought to, and put in, the feeding pens, and fed there until the following spring—appellee, as he claims, furnishing all of the money to buy the cattle and pay expenses; Risinger claiming the money was raised by their note from the bank; but it at least appears appellee paid the bank. In March, 1869, the cattle being ready for market, Neal proposed to purchase the cattle, when appellee offered to take $7.75 per 100 lbs., when Risinger suggested they had better not sell for a few days, and it was agreed they should meet Neal and Black at Peoria in a few days for the purpose of selling to them. This arrangement seems to have been assented to by all parties, and it was arranged that appellee should come to Pekin again on the next Monday.

Within a day or two after this interview, and before the time fixed for meeting Neal and Black, Risinger, without the knowledge of appellee, sold the cattle to appellant at $7.75 per 100 lbs. To evidence this sale, a written agreement was drawn up and signed by the parties, Risinger signing his and appellee's names. When executed, it was placed in the hands of Smith, a son-in-law of Risinger. Appellee was notified on Monday, the day he was to have come to Pekin, of the sale; he came to Pekin in the afternoon and heard the agreement read.

Appellee swears that, as the agreement was read, he understood it gave him the entire control of the money, and that it was to be paid to him when the cattle were weighed. He states that he assented to the sale as he understood it, and said that, as it was made, if carried out in good faith and the money paid to him when the cattle were weighed, it would be right. In this, he is contradicted by opposing testimony, as Smith swears he assented to the sale unconditionally. The time for weighing the cattle not being fixed by the contract, appellee was to have notice. About the 25th of April, one of appellee's sons saw Risinger, and he swears that the latter said the cattle would not be shipped until the 1st of June, and desired the latter to purchase hay to feed them until that time. But he swears he learned, the same day, that it was intended to ship them on the 27th, and he so informed his father.

The weighing of the cattle commenced about seven o'clock on the morning of the 27th of April, without notice to appellee, who lived sixteen miles from Pekin, but he reached there soon after the weighing commenced. Roney says, when he arrived at the scales, Risinger was at work weighing the cattle, and when asked if appellee would be there, he was informed by Risinger that he would not, but they wanted weights of the cattle to telegraph to Chicago, and were unable to get word to appellee in time. The cattle were weighed, and appellee, while it was progressing, complained that the cattle were not weighing enough. And it appears that, when again weighed in Chicago, there was an increase of 3060 pounds in the weight on the lot.

After the weighing had been completed, appellant fixed two o'clock in the afternoon to settle and pay for the cattle. Appellee swears he was at appellant's office, the place specified, five minutes before the time, and on reaching the office was informed that appellant and Risinger had been there and settled, and that the former had given the latter his check on the bank for the amount. Thereupon appellee brought this

suit. This was done about four or five o'clock in the afternoon. Whereupon, one McGrew replevied the cattle from appellee the same evening. The cattle were shipped that night to Chicago; appellant and Smith went to Chicago, and appellee also went. When the cattle arrived at their destination, appellee again replevied them from appellant, into whose possession they seem to have been delivered; and Smith, the son-in-law of Risinger, replevied them in the name of McGrew, from appellee. It was stipulated that all of these suits should abide and be governed by the determination of this.

Appellant insists that the first partnership continued, and he had the right to purchase the cattle of Risinger, and to be protected in his purchase. On the other hand, appellee claims that the purchase was only colorable, and made for the purpose of fraudulently placing the funds in the hands of Risinger; that appellant knew the relations that existed between appellee and Risinger, and even if he did not, he acquired no title to the cattle.

An attentive consideration of the evidence satisfies us that the jury were fully warranted in the conclusion that the first partnership arrangement had been abandoned and a new and different agreement entered into by the parties. It is true, there is conflict in the evidence, but we incline to believe that the weight is on the side of the verdict. Where such is the case, we will not disturb the finding. The jury and the court below have superior means of ascertaining the truth in cases of conflict, as they see and hear the witnesses, and from their appearance, intelligence, and manner on the stand, can better judge of the weight of evidence than we can, who only see the evidence on paper. The new arrangement, then, having superseded the first partnership agreement, it follows that appellee had the right to control the sale of the cattle and to receive the money.

Were the jury warranted in believing, from the evidence before them, that the sale to appellant was fraudulent, and contrived to enable Risinger to possess himself of the money?

We think they were. It is true, that there is much conflict in the testimony, and there may be some doubt, but when all of the evidence is considered, we think it preponderates in favor of the verdict. When it is remembered that parties, entering into fraudulent schemes, endeavor to cover up the true purpose, we must not expect to find clear and undisputed evidence of its existence. The parties seldom entrust their plans to others, and usually, as far as possible, adopt legal forms and the usual course of business to conceal their designs. From these considerations, it is usually a matter of much difficulty to detect and expose fraud in almost every species of transaction.

In this case, without considering all of the evidence which warranted the jury in finding there was fraud, some of the most prominent facts may be enumerated. In the first place, whilst appellant is a large grain dealer, it seems this was his first purchase of cattle for the stock markets. It was a transaction of considerable magnitude even to a large trader. Again, the trade seems to have been made without delay, and within a very short space of time after Neal and Black had proposed to purchase. Again, Risinger sells to him at the same price appellee had offered them to Neal and Black, and to which he objected but a short time previously, and in violation of the agreement to see Neal and Black, and before the time they were to see the latter at Peoria for the purpose of selling to them, and the attempt to have them weighed and shipped without notice to appellee, as had been agreed ; the strange difference in the weights at Pekin and Chicago, the weights being larger at the latter than at the former place, when those having experience say—and it accords with natural laws—that a large shrinkage takes place by shipping cattle on the cars. Again, the meeting of appellant and Risinger after the cattle were weighed, and the settlement and payment to Risinger before the time fixed to meet at appellant's office—all point strongly to a purpose to prevent appellee from controlling the cattle and receiving the pay. And from the

evidence in the case, it makes a strong impression on the mind that it was so planned as to prevent the various steps they took from coming to the knowledge of appellee. And the fact that Risinger, on Saturday before the stock was weighed, told Webster Crosby that the cattle would not be shipped before June, when he and appellant had arranged to weigh and ship on the next Monday, and to weigh before appellee could reach town, even had they, as Risinger pretends, have sent him word on the morning the cattle were weighed, is strong evidence of the secret design imputed to them. This is almost conclusive evidence that the design was concealment and for fraudulent purposes. Other facts might be referred to indicating fraud, but these facts, of themselves, strongly impress the mind that there was in this a secret fraudulent design on the part of Risinger to possess himself of the price of the cattle, and that appellant participated in the design.

It is true, they deny the fraud and attempt to explain their conduct, but they fail to overcome the strong presumption against them arising from the evidence. The jury were fully warranted in finding as they did. In fact, we can not well see how they could have done otherwise. As we have said, the evidence is conflicting, but the circumstances which surround the case tend strongly to support appellee's witnesses. We are not, therefore, inclined to disturb the verdict of the jury.

It is urged, that the court admitted improper evidence on the part of appellee ; that the statements and declarations of Risinger in reference to the arrangement between him and appellee, made when appellant was not present, should not have gone to the jury. They were introduced to prove title in appellee prior to the sale, and were clearly admissible for that purpose; and they were binding on appellant as a privy by purchase from Risinger. This is one of the usual and well recognized modes of proving title as against the vendee of chattels. In this there was no error.

A careful examination of the instructions fails to disclose any error in either giving or refusing them. As to the instruction in the record not marked as given or refused, we will not presume that it was refused ; but, as it is not marked, we will rather infer that it was not presented to the court and accidentally got into the files. It devolves upon appellant to show error, and even if it would have been a material error to refuse it had it been asked, still it fails to appear that it was refused.

On this entire record we fail to see any error, and the judgment of the court below must be affirmed.

*Judgment affirmed.*